Good morning, Your Honors. May it please the Court, Tara Allen of the Federal Defender's Office, on behalf of the appellant James Ballesteros. Your Honors, the Supreme Court has said that only in rare circumstances should a person be forcibly medicated against his will for the sole purpose of rendering him competent to stand trial. And in this case, the Supreme Court laid out very clear, narrow provisions for when the government should be able to do that. This case is absolutely not one of those rare circumstances, because the medication that the government is proposing to force on Mr. Ballesteros is one that the uncontroverted evidence shows is substantially likely to give him – to render him permanently disabled and unable to assist counsel. The evidence in the record shows that with Haldol, people in Mr. Ballesteros's age group – he's, at the time the record was developed, he was 59 years old, now he's 60 years old – have a 30 percent chance, after one year of developing, titer dyskinesia. Kennedy So, Allen, suppose we agree with you. Suppose we agree with everything you say in your brief. Allen Yes, Your Honor. Kennedy What do you see as the result, that we all just wait over a period of time, just preserve the status quo and wait to see what the future brings? Allen Well, according to the statutory provisions, the next step would be a civil commitment-type hearing. Well, but maybe not. Suppose you become sane tomorrow. Kagan Well, there's a period during which the statute, Section 4241, has limitations on how long a determination – how long Mr. Ballesteros can be held for determination. Allen Well, he has the key. He can get out any time he wants. He has the key. Kagan Your Honor, Mr. Ballesteros is a paranoid schizophrenic who has been deemed not competent. Kennedy To make the decision as to whether he wants to take the medicine? Kagan To make the decision regarding his defenses at trial. Kennedy I think the reason you're here is because you assume the only thing that the Court can do is reverse and then try for civil commitment. Isn't that what you think must follow? Kagan That is, in fact, what must follow, given that the government didn't carry its evidentiary burden, Your Honor. Kennedy All right. Go ahead. Kagan Well, you know, tardive dyskinesia, this medical symptom, this side effect that has been demonstrated in the record that Mr. Ballesteros is substantially likely to develop, leaves him with various symptoms like the Parkinson's disease-like symptoms, the muscle spasms, the involuntary jerky movements. In front of a jury, this is not going to play well for Mr. Ballesteros. He won't be competent if he's given Haldol. He won't be able to communicate with his counsel. This is assuming that it doesn't kill him, and it certainly would diminish his ability to show any sort of emotions. The government's doctor also, beside the fact that the government's doctor did not disagree that the medication would have these effects on Mr. Ballesteros, the doctor also proposed treating him with something called congentin to diminish those symptoms. And, again, uncontroverted indication in the record that congentin could interfere with his cognitive abilities, the ability to remember and recall, specifically for older people in Mr. Ballesteros's category. Kennedy There's been no finding that he poses a danger to the community, but does his conduct enter the equation when we look at the case? Blatt I'm sorry, Your Honor. Kennedy Alleged conduct. Blatt His alleged conduct enters into the cell analysis to the extent that the court must determine whether the government has a significant interest, an important governmental interest, in prosecuting this case. And, indeed, the case law shows that, you know, the court does look at the seriousness of the offense and the maximum penalties attached to it, but all of the cell factors have to be satisfied individually, because all of them are important. And I would say that the most important is the best medical interest of the patient that the government is seeking to forcibly medicate. And this is the burden that the government didn't carry. The government's brief did not address the issue of tardive dyskinesia. The district court's order summarily concluded that Dr. Saracen's testimony regarding the medical best interest would be credited. But if the panel looks at the actual testimony of this doctor regarding the side effects in this case, Dr. Saracen says, summarily, these medications are meant to assist rather than interfere with the defendant's ability to interact with counsel. Those cannot be the types of medical reasoned findings that cell meant the court to rely on, and that certainly is suggested by this Court in Rivera-Guerrero that there needs to be a medically developed record, and we don't have a medically developed record in this case. Additionally, the doctors in this case admit that they don't know Mr. Ballesteros' physical history. He hasn't been examined. They don't know his family history. He has never been treated with psychotropic medications as far as we know, and so we don't know the reaction that he'll have. But what we do know is that he has a substantial likelihood of developing tardive dyskinesia. And there simply is this simply is not a close case. This is not the rare circumstances that the Supreme Court intended to have forcible medication orders issue. If the panel doesn't have further questions, I'll reserve the rest of my time for rebuttal. All right. Thank you. Good morning, Your Honors. My name is Steve Lapham. I'm an assistant U.S. attorney in Sacramento, and I handled the case below. So, Your Honor, Your Honors, this individual, Mr. Ballesteros, needs this medication. It is in his best medical interest. Whether we consider the criminal case or not, this man is severely mentally disturbed, and all the medical experts agree that this is in his best medical interest. The defense psychiatrist testified that he is suffering from paranoid schizophrenia. That in a clinical setting in the outside world, this is the medication, antipsychotic medication, that he would recommend for a patient of this type. The government doctors agree with that assessment. The only disagreement is as to which medication is proposed. And even there, the disagreement is not very wide. Both doctors agree that in the best of all worlds, an oral medication, such as Abilify, would be the appropriate medication. That option, unfortunately, has been taken away from us in this hypothetical. We then go to the next best alternative, and that's an injectable. And injectables have necessary side effects. And the government doesn't discount for one moment the grave nature of this situation. It's always a very serious matter when we seek to forcibly medicate anyone in this society. But the injectables have side effects. That must be balanced and was balanced by the Court. And the problem here is that the defense alternative is really no alternative at all. Risperidone-Consta requires an oral medication first. Again, that's something that simply has been taken off the plate for us. Now, I want to address ---- Just could you explain something to me? He's in a medical facility now, right? That's correct. Now, I guess the purpose of this medication that's been ordered is to permit him to stay in trial. Is that right? That's correct. But is it clear that if he were to stay in a medical facility that they'd try to give him the same kind of stuff? Well, in order to forcibly medicate him, because he won't accept it voluntarily, they would have to make a finding of dangerousness. And the prison officials have indicated ---- I didn't understand. They've indicated what? They've indicated that under his current circumstances they don't consider him a danger to self or others. And I think that's objectively verifiable. He's been in custody for approximately two years. There are no instances in that. Now, all of that has been in isolation. There have been no instances of him acting out, no instances of aggressive behavior or anything that would merit medicating based on dangerousness. Now, I was talking about ---- I was going to talk about the potential risks of tardive dyskinesia and other side effects. That, again, is a very real risk, which the government doctors acknowledge. But I think we have to understand two things. First of all, that's a worst-case scenario. That is a potential 30 percent chance of developing those side effects if injectable is used for up to a one-year period. And therein lies the rub, because the hope is that once he is medicated with an injectable for a short period of time, he will become lucid enough to understand that this is in his best interest and will agree to take the oral medication. And these are determinations that I think are quintessentially medical determinations, not legal ones. The doctor on scene can manage the side effects as they ---- he can monitor for side effects, number one. He can monitor or use appropriate drugs to treat those side effects, such as Cogentin and others. And if ---- and he can continually offer to give the defendant the oral medication. And Dr. Sarazin said that would be his plan, to repeatedly reoffer the oral dosage to the defendant. So the side effects are real, but they can be managed. And that's exactly what I think the Court has in mind when they give the discretion to the medical doctors to ---- Counsel? Yes. What's our standard of review? Your Honor, there's some disagreement in the circuits as to the standard of review for the four self-factors. And basically, I think it breaks down this way, that to the extent that the decision is a legal decision, such as whether or not there is a substantial interest, government interest, in trying the defendant, that is the standard of review. A de novo review, and to the extent it's a factual question, such as which medication is more appropriate, whether it is medically appropriate, that is a factual determination which is governed by the abuse of discretion standard. But as far as I'm aware, there's no standard that has been set in this circuit yet. Is there evidence here that if he weren't in a position where he was under serious criminal charges, and there is a desire to bring him, make him competent enough to stand trial, is there evidence that if he were just an ordinary lay patient of these doctors that they would prescribe this stuff? Yes. I think there is, Your Honor. And I think that's exactly what the doctors were saying when they determined that it was medically appropriate. Is that how you interpret that? It was a little ambiguous to me. I interpret it this way, that both doctors have testified that the appropriate medically appropriate treatment for paranoid schizophrenia is antipsychotics. Now, there are first and second generation antipsychotics, the so-called typicals and atypicals, and it's up to the medical discretion of the doctor to choose among the various choices, depending on their patient and other circumstances. But they both agreed that treatment with an antipsychotic of some kind is the medically appropriate remedy. And to amplify on that, talk therapy, other forms of therapy are classically not appropriate for this type of condition. It's a severe mental disease. So, again, it breaks down to basically a choice among bad alternatives to use the Should we be concerned about the probability of side effects considering his age? Yes. Yes, I think that's a very appropriate concern. And you are arguing now that the side effects can be controlled. But the record doesn't definitively show that they can be controlled, does it? Well, it depends on what side effects you're talking about. Once tardive dyskinesia manifests itself, it apparently cannot be controlled. But there are other side effects such as drowsiness, nausea, things of that nature that certainly can be controlled. And Dr. Sarazin pointed out in his testimony, for instance, he could manage the drowsiness for trial purposes by choosing to medicate the defendant at night so that he would be refreshed in the morning. We proposed also that that could be managed by just making the district judge aware of the condition and taking recesses as necessary. But both doctors testified that it would not have any effect on his cognitive function. In fact, they both said it would restore competency and make him better able to assist counsel. So that's what the record states. And, again, we don't minimize the risk of tardive dyskinesia. But, again, the figures that defense counsel are talking about are worst-case scenarios and assume that we'll be continuing permanently with an injectable. And it's always possible at some point that it's an unknown. You don't know how long. You're assuming that there will be some progress in his mental condition, but it's an assumption. We are assuming, because these are – this is an uncertain science here. But even the defense expert, Dr. Quonbach, in his initial letter to the Court, indicated that there was a 70 percent likelihood that he would be restored to competency with the use of antipsychotics. So I think it's a pretty good bet. And, again, these – we have to deal with probabilities. That's what is committed to the discretion of the district judge. Your Honors, I would like to also address – I would like to also address the problem that's created by courts, because the reason there's such a big push to reverse is because once reversed, then the case is practically over except for civil commitment. Isn't that the status? If you were to deny the government the right to involuntarily medicate this defendant, I think that is right, because there's no chance – I think we can safely say there is no chance that he will be restored to competency on his own. He's been untreated for paranoid schizophrenia for essentially his entire life. And it's pretty clear that at the moment he's of no threat to anybody, at the moment, because he's sufficiently confined and he's in isolation. And that's not something anybody would desire. In other words, but for the probability of being able to walk away, you wouldn't choose to remain where he is now as opposed to getting medical help, if you were free to choose. And yet if a court orders it and he dies, it seems to me the court – and he can die, but even if he doesn't, there's serious consequences on this record. So the courts ought to – should have, and maybe every new case presents a new opportunity, let's keep the status quo, see what the future brings. Well, Your Honor, I think that that's one of the reasons the Supreme Court has inaugurated this balancing test. If this were a lesser case, if this – if we were talking about shoplifting, if we were talking about some other relatively minor crime, I think perhaps society could say let's move on down the line, let's see what happens. But we have a man who engaged in a shootout with law enforcement. Well, I'm suggesting when I say the status quo, I'm suggesting let's keep him confined. Through civil commitment. Yes, well. Well, and that would be the normal course of things if we choose not to medicate him. Frankly, you know, it's not – It might be dangerous in civil commitment, though, at the moment. We don't know. He certainly wouldn't be – he would be dangerous if he was in the jail population, wouldn't he? We don't know that. We – the Bureau of Prisons has managed that adequately up to this point in time, and I think that's their call on that one. I'm suggesting that it is, and I'm suggesting the reason they've got him isolated is because they're afraid he couldn't function in the prison population. That very well may be. It's a good question, and I think all the facts are before us, don't you think? I mean, all the facts, and we know what the law is. We've just got to make decisions. I do. There are two things I'd like to say in conclusion. One is that I think we want to encourage the Bureau of Prisons to use the least restrictive alternative. In this case, they found that they could adequately manage the prison population, this particular individual, through alternatives other than – than involuntary medication. I think that's what we want, to properly protect a defendant's constitutional rights from involuntary medication. I also want to just briefly touch on the defense argument, the absence of administrative hearing. That argument was never before the Court, and I think just a brief review of the procedural history of this case is adequate to demonstrate that. The judge, district judge in this case, got the letter from Bureau of Prisons indicating that the defendant was not willing to accept voluntary medication. He set a status conference. At that status conference, he asked the parties how they wished to proceed, and an evidentiary hearing was set up. At no time up to this point did the defendant make the argument that the case needed to be remanded for further administrative hearings. The government was ordered to file a brief in which we discussed the self-factors and what the government intended to prove at the evidentiary hearing. We made a proffer of the psychiatrist's testimony. There was no responsive brief by the defense objecting to any of that. We went to an evidentiary hearing, put on our testimony. Again, that transcript is devoid of any argument by the defense that the case should be remanded for administrative hearing. The defense asked for continuance for another evidentiary hearing so they could put on their doctor. That hearing went forward without a peep out of the defense regarding the need for further administrative hearings. Three days in advance of that hearing, they filed a brief and indicated that the judge or the government had not adequately considered the dangerousness of the defendant. They cited no regulations, no administrative procedure for doing that. There was nothing to alert the district judge that this was at all an issue in the  It was argued nearly over two months later, after the defense requested another continuance, to get transcripts. The transcript of that argument is devoid of any discussion about the need for an administrative hearing. So I think the defendant has forfeited that argument. It's just not on the table. What we're really talking about is the district judge's exercise of his discretion in concluding that the government's option to medicate was the only one. In other words, there's nothing to indicate that the defendant ever in the first instance indicated that he wanted to have this determined by the prison folks rather than the district court. That's correct. Thank you. Counsel, before you conclude. Yes, ma'am. On the standard of review question, why couldn't we view this as a mixed question of law and fact, thereby subject to de novo review? Well, I think that would be one option. What I was suggesting in my earlier answer was that you may want to parse the issues. There are four self-factors. Some of those self-factors lend themselves to a legal determination. Which would be de novo review. And others of those factors are more factual in nature, which would be abuse of discretion. The primary issue in this case to me is an abuse of discretion, whether the judge reviewing the facts presented by the defense psychiatrist and the facts presented by the government psychiatrist determined that the government psychiatrist and his choice of medication was the appropriate one. I think that's more of a factual determination. He heard the testimony from the two doctors and was able to question them on that issue. Thank you. Your Honor, thank you. Thank you. Your Honor, I want to respond to Mr. Lapham's representation that TARDIV dyskinesia is the worst-case scenario. In fact, that's not what the record shows. There was testimony by Dr. Quonvac that Mr. Ballesteros is substantially likely to develop dyskinesia. That nothing was ever said that that would be the worst-case scenario. Moreover, even though there is, of course, some latitude and discretion in terms of determining the dosage of this medication, the burden is on the government to propose a medical plan that they plan to implement with regard to this particular patient. Cell requires that much. And in this case, this is not a matter of injecting Mr. Ballesteros with the medication and seeing if he has this reaction that is not reversible and untreatable, especially in light of the record, which indicates that for people in his age category, the chance is so substantially high. I also want to ---- Why are we faced with this dilemma? Well, I'm not sure what Your Honor means. Because neither the Mr. Ballesteros or people representing him have any plan for voluntary medication? I think that we're faced with this dilemma because through no fault of his own and through a manifestation of his illness, Mr. Ballesteros is refusing to be medicated. And because the Supreme Court has said that he has a substantial liberty interest in remaining free of involuntary medication. I think that that's how we get to this point. And the reason we're ---- Your Honor, I don't think that the standard is that he's making a rational decision. It's that he has that choice to make. Yeah. But underlying it is sort of the notion that this is a sensible decision. And therefore, we aren't going to force him to do something against his will, assuming it's his will, unless we ---- Yes. Yeah. And that's why it's so important that the medical record in particular be developed. I mean, I also want to say that in terms of, you know, the doctor's proposal that he'll be injected with this medication, which can immediately give him effects. The doctor actually proposed injecting this short-term, excuse me, this immediate acting Haldol over a period of four or five days. And, yes, asking him whether he would like to take an oral medication. But I think that the panel should recognize that the record also indicates what that forced medication looks like. Dr. Sarazin testified that five officers would come into this man's cell and shackle his hands, his feet, hold him down, wearing protective gear, and then stick a needle in his gluteus muscle. And they would do this as many times as they deemed necessary until he voluntarily wanted to take this medication. This is what the government is proposing, and this is why the standard is very high. And this is why the courts have said that the court is not in the best position to make these medical determinations. There has to be a fully developed record in this regard. And in this case, Your Honor, there simply isn't one. And if to the extent that there's any evidence outweighing any other evidence, it's that Mr. Ballesteros is substantially likely to develop totive dyskinesia and not be competent. And so what is your bottom line on what the court's decision should be? The court should reverse the district court's order. It is an error. And direct the district court to remand this case for a determination of civil commitment hearings. I mean, that is the next procedure. Your Honor, has a question? No. Okay. Any further questions? Thank you, Your Honor. Thank you. The case just argued is submitted for decision. And that concludes the Court's calendar for this morning. The Court stands adjourned. All rise. The Court for this session stands adjourned.
judges: Schroeder, Farris, Rawlinson